

COMMONWEALTH OF MASSACHUSETTS

ESSEX, SS

TRIAL COURT DIVISION
ESSEX SUPERIOR COURT
CIVIL ACTION #: 1577CV01902A

EUGENE PELIKOV
        Plaintiff,

vs.

GOLD AND FARB, INC., LEV GOLDFARB,
ALEXANDER GOLDFARB AND
LYDMILA ROGALIN
        Defendants.

## DEFENDANTS' MOTION TO COMPEL ARBITRATION AND TO STAY THE PROCEEDING

---

NOW COME, Gold and Farb, Inc., (hereinafter "GFI"), Lev Goldfarb, Alexander Goldfarb and Lydmila Rogalin (hereinafter the "Defendants") and hereby move to compel arbitration and to stay the proceeding on the grounds that the Plaintiff's claims are based on a certain Shareholders' Agreement between the Plaintiff and the Defendants and the Plaintiff has failed to arbitrate his claims as required under the Paragraph 5.8 said Shareholders' Agreement. The Shareholders' Agreement has been incorporated by reference in Paragraph 13 of the Plaintiff's Complaint and thus became a part of the pleadings. See Exhibit "1".

The relief sought by this Motion is mandated by M.G.L. Ch. 281, Sec. 1. et seq. and the Federal Arbitration Act, 9 U.S.C. Sec. 1 et seq. In McInnes v. LPL Financial LLC, Massachusetts Supreme Judicial Court held that a both the Massachusetts Uniform Arbitration Act for Commercial Dispute and the Federal Arbitration Act require strict enforcement of the contracts to arbitrate. 466 Mass. 256, 994 N.E.2d 790 (Mass. 2013). A copy of the cited decision is attached hereto as Exhibit "2"

Furthermore, the Defendants move this Court to stay the instant proceeding, including all discovery, pending the arbitration of the controversy.

WHEREFORE, The Defendants move this Court to issue an order staying this proceeding and compelling the Plaintiff to submit to binding arbitration.

GOLD AND FARB, INC.,
LEV GOLDFARB
ALEXANDER GOLDFARB and
LYDMILA ROGALIN
by their counsel:

Vladimir von Timroth, Esq. BBO #643553
Law Office of Vladimir von Timroth
405 Grove Street, Suite 204
Worcester, MA 01605
Telephone: 508-756-2006
Facsimile: 774-221-9146
vontimroth@gmail.com

DATED: March 24, 2016

## CERTIFICATE OF SERVICE

I, Vladimir von Timroth, do hereby certify that I provided a copy of the within DEFENDANTS' MOTION TO COMPEL ARBITRATION AND TO STAY THE PROCEEDING by overnight mail, postage prepaid this 24th day of March, 2016 to the parties below:

Vladimir von Timroth, Esq. BBO#643553

Eugene Pelikhov
c/o Matthew Shayefar, Esq.
Valentin David Gurvits, Esq.
Boston Law Group, PC
825 Beacon St., Suite 20
Newton Centre, MA 02459

A TRUE COPY, ATTEST
DEPUTY ASS'T. CLERK

# Exhibit 1

### Gold and Farb, Inc.

## STOCKHOLDERS' AGREEMENT

THIS STOCKHOLDERS' AGREEMENT is made as of January 18, 2008, by and among Gold and Farb, Inc., a Massachusetts corporation with its principal office at 145 Broad Street, Lynn, Massachusetts (the "Corporation"), and the individuals listed on the attached Exhibit A (such individuals sometimes hereinafter referred to individually as a "Stockholder" and collectively as the "Stockholders").

WHEREAS, the Corporation is duly organized and validly existing under the laws of the Commonwealth of Massachusetts with authorized capital stock consisting of 1,000 shares of Common Stock, $0.01 par value per share (the "Common Stock"), of which 1,000 shares of Common Stock, as of the date hereof, are issued and outstanding to the Stockholders (the "Shares"), with each Stockholder owning that number of shares set forth opposite such Stockholder's name on the attached Exhibit A;

WHEREAS, the Corporation is, and at various times in the future may be treated for purposes of federal and state income taxes as an S Corporation (an "S Corporation"), in accordance with Section 1361 et seq. of the Internal Revenue Code of 1986, as amended (the "Code") and the Stockholders all agree and acknowledge that it is in the Corporation's best interest and in the best interest of each of the Stockholders that the Corporation's election to be taxed as an S Corporation (its "S Election") not be terminated other than at times and under circumstances in which all of the Shareholders agree that it has become advisable to do so;

WHEREAS, the Stockholders understand the effects of making the S Election, and the necessity of placing certain restrictions upon transfer of the Shares (as defined below) in order to preserve the validity of the S Election;

1

WHEREAS, the Corporation and the Stockholders have determined that it is in their mutual best interests to provide for continuity of the S Election and in the management and policies of the Corporation, to restrict the ownership of Shares to individuals who can and are expected to contribute to the growth and success of the Corporation, to restrict the transferability of the Shares and to provide for their repurchase by or at the direction of the Corporation and the Stockholders in certain events; and

NOW, THEREFORE, in consideration of the foregoing premises and the covenants and agreements herein which are mutually and severally made by the parties hereto, it is hereby agreed as follows:

## ARTICLE 1 - DEFINITIONS

For all purposes of this Agreement and the Exhibits annexed hereto, the following definitions shall apply, unless the context otherwise requires:

(a) "Agreement" shall mean this Stockholders' Agreement and the Exhibits annexed hereto, as amended from time to time.

(b) "Disability" shall mean the mental or physical disability as determined by a majority of the Board of Directors on the basis of medical evidence that the Stockholder is unable, by reason of some mental or physical impairment, to fully, adequately and consistently with prior performance perform such Stockholder's duties as an employee or Director of the Corporation for a period of (i) 60 consecutive days or more or (ii) 120 days or more during any six month period. The Board's determination of a stockholder's disability will be binding on all parties. For

2

purposes of making such Board determination as to the disability of a Stockholder, such Stockholder shall not be entitled to vote as a Director.

(c) "**Shares**" shall mean any and all shares of the Common Stock now owned or hereafter acquired by a Stockholder, any capital stock of the Corporation issued after the date hereof with respect to or in replacement of such Common Stock and any capital stock, of any class, of the Corporation now or hereafter owned by any Stockholder.

(d) "**Stockholders**" shall mean the persons identified as Stockholders on Exhibit A of this Agreement and every person who shall subsequent to the date hereof join in and become a party to this Agreement by executing and delivering to the Corporation an Instrument of Adherence in the form of Exhibit B annexed hereto.

(e) "**Termination for Cause**" shall mean the termination of a Stockholder's employment with the Corporation arising from one or more of the following: (i) the Stockholder shall have committed an act of fraud, embezzlement, misappropriation or breach of fiduciary duty against the Company or any of its subsidiaries, including, but not limited to, the offer, payment, solicitation or acceptance of any unlawful bribe or kickback with respect to the business of the Company or any of its subsidiaries, as determined by a court of competent jurisdiction; or (ii) the Stockholder shall have been convicted by a court of competent jurisdiction of, or pleaded guilty or nolo contendere to, any felony (excluding any felony resulting from operating a motor vehicle); or (iii) the Stockholder shall have refused, after explicit written notice, to obey any lawful and reasonable resolution of or direction by the Board which is consistent with duties under his or her employment agreement; or (iv) the Stockholder shall have been chronically absent from work (excluding any vacations, any illnesses or physical or mental disability or any leaves of absence approved by the Company) and such absence shall have continued for a period

3

of 20 days after written notice to the Stockholder specifying such failure in reasonable detail; or (v) the Stockholder shall have engaged in the unlawful use or possession of illegal drugs on the Company's premises; or (vi) the Stockholder shall have breached any of the provisions of the Confidentiality, Non-Solicitation or Non-Competition provisions Article 4 of this Agreement.

(f) "**Transfer**" shall mean, as to any of the Shares, to sell, transfer, assign, distribute, pledge, hypothecate, encumber or otherwise dispose of, by gift or by will, or in any other way directly or indirectly, either voluntarily or involuntarily, or to have taken any of the aforesaid actions, as the context requires.

(g) "**Transferor**" shall mean the Stockholder offering his Shares, or who is deemed to have offered his Shares, pursuant to Sections 2.3s of this Agreement.

## ARTICLE 2 - RESTRICTIONS ON TRANSFER OF SHARES

2.1 In General. This Agreement shall, during its term (which shall commence as of the date first set forth above), apply to all Transfers of Shares, now owned or hereafter acquired by the Stockholders, whether voluntary, involuntary or by operation of law, and whether resulting from death, bankruptcy, insolvency or otherwise.

2.2 Restrictions on Transfer of Shares. No Stockholder shall, during the term of this Agreement, Transfer any Shares, or any interest therein, to any person or entity except as otherwise specifically provided for in this Agreement, and any Transfer of Shares not specifically permitted by, or in violation of, this Agreement shall be void and of no effect. Without limiting the generality of the foregoing and despite the fact that neither the Corporation nor the other Stockholders exercise their right of first refusal as provided herein, no Stockholder may transfer all or any portion of his or her Shares to any person or entity, if such transfer will or may reasonably be expected to result in a termination of the Corporation's S Election. Any transfer

4

or other disposition of Shares in violation of the restrictions on transfer contained herein or resulting in termination of the Corporation's S Election in violation of the terms of this Agreement shall be null and void and shall not entitle the Stockholder or any proposed transferee or other person to have any Shares transferred upon the books of the Corporation. Such prohibited transfers include, but are not limited to, (a) the transfer of any Shares to a partnership, corporation, nonresident alien individual, estate (other than the estate of the Shareholder himself of herself) or trust (other than a trust that under the Code may hold S Corporation stock without terminating the S Election), and (b) the transfer of any Shares to more than one (1) person, when the increased number of Shareholders puts the total number of Stockholders of the Corporation to more than the maximum permissible number of stockholders of an S Corporation (presently one hundred (100)). Furthermore, no Stockholder will take any other action which would result in the termination of the S Election.

2.2.1 Waiver of Restrictions; Pledge of Shares as Collateral. The restrictions on transfer set forth herein may be waived by the unanimous vote of the Directors of this Corporation. The restrictions on transfer set forth herein shall not apply to any bona fide pledge of the Shares as collateral to secure a loan or financial commitment of the Corporation from a bank or other recognized financial institution, which loan is not for the purpose of circumventing the restrictions set forth herein; provided, however, the provisions hereof shall apply to any Transfer of such Shares by any such pledgee whether by foreclosure or otherwise.

2.2.2 Restrictions on the Corporation. The Corporation shall not engage in any transaction which shall terminate the Corporation's S Election. Without limiting the generality of the foregoing, so long as the taking of such actions will result in a termination of the Corporation's S Election the Company shall be prohibited from: (a) issuing a second class of stock of the

Corporation (other than nonvoting common stock) as determined pursuant to Section 1361 of the Code and the regulations thereunder; (b) issuing debt instruments, other than those which constitute straight debt as defined under Section 1361 of the Code and the regulations thereunder; (c) purchasing over eighty percent (80%) of the stock of another corporation; and (d) entering into the banking, thrift or insurance company business or from making tax elections which may terminate its S Election.

2.2.3 Representations; Consent to Election; Duration of Election. Each Stockholder hereby represents that such Stockholder is an eligible S Corporation shareholder (an "Eligible Shareholder") as defined by the Code. Each Stockholder hereby consents to the Corporation's S Election, and agrees to execute Internal Revenue Service Form 2553 or its successor if necessary, and such other or additional documents and consents as the Board of Directors of the Corporation in its discretion considers necessary or desirable to continue the S Election in effect.

The Corporation and the Stockholders agree that from and after the date hereof, (i) the Corporation shall maintain its status as a S Corporation until the Corporation and each Stockholder agree to terminate such status, and (ii) that if in the absence of such an agreement such a termination nevertheless occurs, then immediately upon its discovery the officers of the Corporation shall take action pursuant to Section 1362(f) of the Code to restore the status of the Corporation as an S Corporation. To effectuate the termination of the S Election pursuant to (i) above, the Company shall complete, execute and file with the Internal Revenue Service a revocation statement together with all other necessary documents, including any necessary statements of consent from Shareholders, and each Stockholder shall execute and deliver to the Corporation any statement of consent or other documents required under Subchapter S of Chapter 1 of the Code to be filed in connection with the termination of the S Election.

2.3 <u>Events Giving Rise to Purchase Options</u>. The Corporation and the Stockholders shall have the options to purchase Shares of a Transferor as provided in this Section 2.3. Options shall be exercised in accordance with the time periods set forth in Section 2.4, at the price set forth in Section 2.5 and upon the terms set forth in Section 2.6.

2.3.1 <u>Third Party Transfer</u>. If at any time a Stockholder desires to Transfer any or all of the Shares owned by such Stockholder pursuant to a bona fide written commitment from a third party who is not a Stockholder (the "Prospective Transferee"), the Transferor shall submit a written offer to sell all of such Shares to the Corporation and all Stockholders in accordance with the terms and conditions of this Article 2 (the "Third Party Transfer Offer"). The Third Party Transfer Offer shall disclose the identity of the Prospective Transferee, the number of Shares proposed to be transferred, the agreed terms of the Transfer and any other material facts relating to the Transfer.

As a condition precedent to the transfer of any Shares, the transferring Stockholder shall obtain from the Corporation a written certification that neither the contemplated transfer nor any contemplated transaction with respect thereto (including, without limitation, the foreclosure of any lien or encumbrance; or, in the case of a transfer in trust, the termination of the trust or the taking of any action by the beneficiary of the trust) will or might result in the termination of the S Election. The Corporation may require as a condition precedent to providing any such certification any or all of the following:

(a)        an opinion of its counsel, satisfactory in form and substance to the Corporation, as to the matters to be contained in such certification; and

7

(b)      arrangements satisfactory to the Corporation to ensure that the transferee will take all actions and execute all documents necessary to preserve the S Election (including, without limitation, in the case of any transfer in trust the timely filing of an election pursuant to Section 1361(d) of the Code).

2.3.7 Involuntary Transfers. The transfer of title to a Stockholder's Shares to an attaching or judgment creditor, a purchaser at a judicial sale, a receiver or trustee in bankruptcy or assignee for the benefit of creditors  shall operate, without anything further, as an offer by the Stockholder or such Stockholder's transferee to sell all of such Shares in accordance with the terms and conditions of this Article 2 as of the date title is transferred (the "Involuntary Transfer Offer"). For purposes of this Agreement, the Third Party Transfer and the Involuntary Transfer Offer shall sometimes be collectively or individually referred to as the "Offer."

2.4 Option Periods. The purchase options described in Section 2.3 shall be exercised as follows:

2.4.1 First Purchase Rights. (a) In the case of a Third Party Transfer Offer and Involuntary Transfer Offer, the Corporation shall have the first right to purchase all but not less than all of the Shares covered by the Offer (the "Offered Shares"). The Corporation shall act upon the Offer within the  (30) days after actual receipt of the Offer, or, at the Corporation's option, actual notice of the event giving rise to the Offer (the "Offering Period"). If the Corporation elects to purchase all the Offered Shares, the Corporation shall give written notice to the Transferor and all other Stockholders, before the end of the Offering Period, of its election to purchase, which notice shall, when taken in conjunction with the Offer, be deemed to constitute a valid, legally binding and enforceable agreement for the sale and purchase of the Offered Shares covered thereby. The closing of such purchase and sale shall take place at the offices of the Corporation

at a mutually agreeable time and date, but during business hours and in all events within fifteen (15) days after receipt of the Corporation's election to purchase (the "Closing Period").

2.4.2 Second Purchase Rights. If the Corporation elects not to purchase all of the Offered Shares within the Offering Period, or fails to purchase all of the Offered Shares within the Closing Period, the Stockholders shall have the right to purchase all but not less than all of the Offered Shares, pro rata, in proportion to their respective ownership of the Common Stock of the Corporation as of the date of the Offer. The right to purchase the remaining Offered Shares may be exercised by giving written notice to the Transferor, the other Stockholders and the Corporation within fifteen (15) days after the expiration of the Offering Period or, in the event the Corporation fails to purchase the Offered Shares which it elected to purchase, within fifteen (15) days after the receipt of notice from the Transferor that the Corporation failed to purchase the Offered Shares (the "Stockholder Offering Period"). If any Stockholder elects not to purchase such Stockholder's pro rata amount of the remaining Offered Shares, the remaining Stockholders shall then have the right to purchase all, but not less than all, said remaining Offered Shares pro rata and shall give the Transferor and the other Stockholders notice of their election to purchase no later than five (5) days after the expiration of the Stockholder Offering Period. If the other Stockholders shall collectively elect to purchase all of the remaining Offered Shares, the notices of exercise shall, when taken in conjunction with the Offer, be deemed to constitute a valid, legally binding and enforceable agreement for the sale and purchase of the Offered Shares covered thereby. The closing of such purchase and sale shall take place at the offices of the Corporation at a mutually agreeable time, but in all events within fifteen (15) days after receipt of the final Stockholder election to purchase (the "Stockholder Closing Period").

9

2.4.3 Sale to Prospective Transferee. If, in the case of a Third Party Transfer Offer, the Corporation or the Stockholders do not purchase the Offered Shares, the Offered Shares may be sold by the Transferor to the Prospective Transferee at any time within sixty (60) days after the expiration of the five-day option period described in Section 2.4.2. Any such sale shall be at not less than the price specified in the Offer and upon other terms and conditions, if any, not more favorable to the Prospective Transferee than those specified in the Offer. If the Transferor does not so sell the Offered Shares within such 60-day period, the Offered Shares shall thereafter again be subject to all of the restrictions and provisions of this Article 2.

2.4.5 Stock to Remain Subject to this Agreement. If an option to purchase Shares under any Section of this Article 2 is not timely exercised or closed, then the Shares not purchased shall remain subject to all of the restrictions and provisions of this Agreement.

2.4.6 Corporation's Right to Assign Purchase Rights and Obligations. In all circumstances under this Article 2, the Corporation may assign its right or obligation to purchase Shares, as the case may be, to one or more assignees, including the non-Transferor Stockholders.

2.5 Purchase Price. Notwithstanding anything to the contrary contained in this Agreement, in the case of an Involuntary Offer, the purchase price of the Shares shall be the Fair Value of the Shares, as defined in this Agreement.

2.6 Purchase Terms. (a) At the Closing of a purchase option exercised under Section 2.4, the Transferor shall deliver to the Corporation and the Stockholders, as the case may be, stock certificates evidencing the Offered Shares to be transferred, which shares shall be validly issued, fully paid and nonassessable and shall not be subject to any liens, encumbrances, restrictions on transfer or rights of others, accompanied by executed stock assignments.

(b) At the Closing of a purchase option exercised pursuant to a **Third Party Transfer Offer** or an **Involuntary Termination Offer**, the Corporation or the Stockholders, as the case may be, purchasing the Offered Shares shall pay for such Shares by delivering to the Transferor one or more bank checks or money orders in an amount equal to the entire purchase price.

2.7 Fair Value of Shares. For purposes of this Agreement, the fair value (the "Fair Value") per share of the Shares shall be equal to an amount determined by the Company's certified public accountants (the "Company Accountants") and initially agreed to by all of the Stockholders and set forth in a certificate signed by all of the Stockholders, substantially in the form of Exhibit D annexed hereto (the "Certificate of Value"). The Certificate of Value shall be completed and executed by the Stockholders immediately upon execution of this Agreement. Within twelve months of the date hereof and every twelve months thereafter, or more frequently as they may determine, the Company Accountants shall restate the Fair Value per share of the Shares, which restated Fair Value shall be set forth in a new Certificate of Value. Notwithstanding the foregoing, the Fair Value of the Shares shall be subject to change as follows:

(i) If the most recent Certificate of Value is dated twelve (12) months or less prior to the date of the event triggering the option to purchase hereunder (the "Triggering Event"), the Fair Value per share shall be the Fair Value as set forth in that most recent Certificate of Value.

(ii) If the most recent Certificate of Value is dated more than twelve (12) months but eighteen (18) months or less prior to the date of the Triggering Event, the Fair Value per share shall be adjusted to reflect any increase or decrease in value of the Corporation, on a per share basis, as determined by the Company Accountants using the same criteria that was used to determine the Fair Value at the time the most recent Certificate of Value was executed.

11

(iii) If the most recent Certificate of Value is dated more than eighteen (18) months prior to the Triggering Event, then the Fair Value per share shall be determined by agreement of the parties. If the parties cannot agree on the Fair Value of the Shares, that value shall be determined by appraisal. The Transferor and the Corporation or the Stockholders wishing to purchase the Offered Shares, as the case may be, shall each engage an appraiser. Fair Value shall be the amount agreed upon by both appraisers. In the event of a disagreement between the two appraisers, if the lower appraisal is ninety percent (90%) or more of the higher appraisal, then fifty percent (50%) of the difference shall be added to the lower appraisal and that total shall be the Fair Value. If the lower appraisal is less than ninety percent (90%) of the higher appraisal, the Transferor and the Corporation or the other Stockholders, as the case may be, shall seek binding arbitration before the American Arbitration Association in Boston, Massachusetts in accordance with the Commercial Arbitration Rules of that Association. The arbitrator(s), who shall have direct experience in business valuations, shall consider such evidence as they may consider relevant to the valuation of the Shares and shall within forty-five (45) days of their selection deliver in a writing to the Transferor and the Corporation or the other Stockholders, as the case may be, their findings with respect to the Fair Value of the Shares as of the date of the Triggering Event. All costs of the arbitration, other than the fees for the appraisers engaged by each party, shall be borne equally between the Transferor, as seller, and the Corporation or the other Stockholders, as the case may be, as buyer(s).

2.8 Conditions Prior To Voluntary Transfer. As conditions precedent to the Transfer of any Shares to a Prospective Transferee who is not already a Stockholder, the Transferor shall become a party to, and be bound by the provisions of, this Agreement by executing and delivering to the Corporation and all the Stockholders an Instrument of Adherence in the form of the attached

Exhibit B. Said Instrument of Adherence shall become a part of this Agreement, and the Shares

transferred to the Transferee shall remain subject to all the terms of this Agreement. Upon such

Transfer of Shares, all references herein to a Stockholder or the Stockholders shall thereafter be

deemed to include such Transferee. Notwithstanding any failure by a Transferee to execute the

Instrument of Adherence, the Transferee shall be subject to the provisions of this Agreement and

the Shares transferred to the Transferee shall continue to be restricted by this Agreement.

2.9 Cooperation of Corporation. The Corporation, for itself and its successors and assigns,

hereby consents to this Agreement and agrees not to Transfer any Shares of its Common Stock in

violation of the provisions of this Agreement.

2.10 Specific Performance. No Stockholder shall have the right or power to sell or assign any

Shares except in strict compliance with the terms and conditions set forth in this Agreement. The

parties hereto agree that the Shares are unique, that failure to perform the obligations provided by

this Agreement shall result in irreparable damage, and that specific performance of these

obligations may be obtained by suit in equity.

2.11 Corporation's Purchase Controlled by Law. Notwithstanding any other provision of this

Agreement, it is understood and agreed that the Company shall not be required to purchase any

Shares except to the extent that the Company is authorized and permitted to do so pursuant to the

laws of the Commonwealth of Massachusetts. With respect to purchases by the Company, the

Stockholders agree to take any and all legally permissible steps as may be appropriate in order

for the Company to purchase the Shares in accordance with this Agreement. Stockholders agree

to take all steps necessary to vote their respective shares of stock and take such other steps as

may be appropriate and necessary and to cooperate in all corporate actions that may be required

in order for Corporation lawfully to purchase and pay for shares. Corporation agrees to take the

13

steps that may be appropriate and necessary in order for Corporation to lawfully purchase and pay for shares.

2.12 Claw Back Rights. If all or part of a deceased Stockholder's Shares are purchased pursuant to the provisions of this Agreement, and, within 365 days after the death of the Stockholder, all or substantially all of the assets, or more than fifty percent (50%) of the outstanding stock, of the Corporation is sold in one or more related transactions, or if the Corporation is merged, consolidated or liquidated, the deceased Stockholder (or his estate) shall be entitled to receive a portion of the proceeds of any such sale, merger, consolidation or liquidation equal to (i) the product of (A) the Purchase Price Per Share (as defined below) multiplied by (B) the number of Shares acquired from the deceased Stockholder (or his estate) (the "Acquired Shares"), less (ii) the amounts previously paid for the Acquired Shares. If the preceding computation results in a number equal to or less than zero, the deceased Stockholder, and his estate, shall not be required to pay any portion of the proceeds of such sale, merger, consolidation or liquidation. "Purchase Price Per Share" means the quotient of (x) the net proceeds of any such sale, merger, consolidation or liquidation received by the other Stockholder (or the Corporation in the case of a sale of all or substantially all of its assets), divided by (y) the total number of shares of stock of the Corporation outstanding immediately before the death of the Stockholder, including the shares, if any, owned by stockholders of the Corporation not party to this Agreement. In the case of a sale of all or substantially all of the assets of the Corporation, the payment due the deceased or disabled Stockholder (or his estate) under this Section 2.5(b) shall be made by the Corporation. In the case of a sale of more than fifty percent (50%) of the outstanding stock of the Corporation or of a merger, consolidation or liquidation, the payment shall be made by the other Stockholders.

14

## ARTICLE 3 - STOCKHOLDER AND DIRECTOR ACTIONS

3.1 Stockholder Election of Directors. Each Stockholder covenants and agrees that at each annual meeting of the stockholders of the Corporation, and at each special meeting of the stockholders of the Corporation called for the purpose of electing directors of the Corporation, and at any time at which stockholders of the Corporation shall have the right to, or shall, vote for directors of the Corporation, then and in each event, such Stockholder shall vote all of such Stockholder's Shares entitled to vote thereon for a Board of Directors comprising not less than three (3) members, including Lev Goldfarb, Alexander Goldfarb, and Eugene Pelikhov, (or their designee) as long as each of them is a stockholder owning not less than 10% of the voting shares of the Corporation. If any Stockholder sells Stockholder's Shares such that Stockholder owns less than 10% of the voting shares of the Corporation, such Stockholder shall no longer be entitled to be (or to nominate) a Director and such position as Director shall be filled or eliminated as determined by vote of a majority in interest by percentage of the remaining Stockholders. Upon a vacancy on the Board of Directors, each Stockholder covenants and agrees to vote all of such Stockholder's Shares in accordance with the procedure described in this Article 3 in order to fill such vacancy.

3.2 Director Election of Officers. Each Stockholder covenants and agrees that at each annual meeting of the Directors of the Corporation, and at each special meeting of the Directors of the Corporation called for the purpose, among other things, of electing officers of the Corporation, and at any time at which Directors of the Corporation shall have the right to, or shall, vote for officers of the Corporation, then and in each event, each such Stockholder shall vote Lev Goldfarb as President and Alexander Godlfarb as Secretary of the Corporation and Treasurer of the Corporation.

15

3.3 Distributions to Stockholder.  One effect of an S Election is that all of the Corporation's net profits are taxed directly to the Stockholders, even if such net profits are not distributed. Because such taxation of the Corporation's net profits could, without any corresponding distribution of such net profits, cause a hardship on some Stockholders, the Corporation agrees that for each of its taxable years while the S Election is in effect and during which such Stockholder owns Shares of stock of the Corporation (and not merely options to acquire Shares), it will distribute to each Stockholder, for each Share owned by the Stockholder, cash in an amount at least equal to each Share's pro rata portion of the product of (a) the amount of the Corporation's net profit, net long-term capital gains and net gains from the sale or exchange of assets the gains from which are taxable under Section 1231 of the Code and which are taxable to the Stockholder and (b) the highest cumulative maximum applicable statutory rate of federal and Massachusetts state income tax payable by any Stockholder (that is, the sum of the maximum rates of federal and Massachusetts state income tax, adjusted to take into account the deductibility of Massachusetts state income tax for purposes of determining federal income tax); provided, however, that (i) such distributions shall be conditioned on the determination by the Corporation, in its sole discretion, that funds are legally available for distribution and that making such distribution would not subject the Corporation or any of its officers or directors to liability to any person, (ii) the Corporation, in its sole discretion, shall determine the amount of cash , if any, to be distributed to each Stockholder and (iii) such tax distributions shall not be made if they shall cause the Corporation to be deemed to have more than one class of stock under Section 1361 of the Code and the regulations thereunder.  Regardless of any distributions made to the Stockholders pursuant to this Section 3.3, the Corporation's outstanding shares of stock shall confer identical rights to distribution and liquidation proceeds to its Stockholders and

the Corporation shall make such distributions and any other distributions in a manner such that all shares of stock have such identical rights. Distributions of the amount described in the preceding sentence shall be made on or before each date on which estimated income tax payments are due and payable by the Stockholders and the aggregate amount distributed by the Corporation on the occasion of each such distribution may be equal or unequal in size; provided however, that the amount distributed by the Corporation with respect to each share of stock shall at all times be equivalent on a per share basis. Nothing in this Section 3.3 shall be construed to prevent the Corporation from making distributions to any Stockholder more frequently than, or in larger amounts than, the minimum distributions herein described.

## ARTICLE 4 - CONFIDENTIALITY
## NON-COMPETITION AND NON-SOLICITATION

4.1 Confidential Information. For so long as a Stockholder owns Shares and at all times thereafter, such Stockholder agrees not to disclose any confidential or proprietary information of the Corporation or its customers, including without limitation, customer lists, customer contracts, prospective customer lists, business plans, marketing plans, financial statements and financial projections, and agrees to hold such information strictly confidential, except to the extent such information is (i) generally known and used by persons with training and experience comparable to such Stockholder, (ii) common knowledge in the Corporation's industry, or (iii) otherwise in the public domain by virtue of other than a breach of this confidentiality provision or any similar confidentiality provision between the Corporation and another person. Upon Termination of a Stockholder's employment, consulting arrangement or directorship with the Corporation or purchase of all of Stockholder's Shares, each Stockholder will return to the Corporation all

17

documents and materials containing any such information which were prepared or received in connection with such Stockholder's employment, consulting arrangement or directorship or otherwise, and which are in such Stockholder's possession, custody or control including, without limitation, all software, computer printouts, computer disks and tapes, files, customer lists, rolodex cards, diagrams, brochures, books, articles, papers and records of every kind and description.

4.2 Non-Competition. Each Stockholder covenants and agrees that so long as such person is a Stockholder, employee, consultant or director of the Corporation, and for a period of two (2) year thereafter, such Stockholder will not directly or indirectly, whether as an officer, director, stockholder, partner, proprietor, associate, representative, consultant or otherwise, become or be employed or retained by or financially interested in, any other person, corporation, firm, partnership or other entity whatsoever engaged in any business in competition with the Corporation's business. The geographic limitation shall be Essex County, Massachusetts.

4.3 Non-Solicitation. Each Stockholder covenants and agrees that during the term of such Stockholder's employment, consulting arrangement or directorship with the Corporation, and for a period of two (2) year thereafter, such Stockholder shall not, for such Stockholder's own benefit or for the benefit of any person or entity other than the Corporation, solicit any employee of the Corporation or any affiliate of the Corporation to leave his or her employment.

4.4 Corporate Opportunities. Each Stockholder covenants and agrees that so long as such person is a stockholder of the Corporation, unless and until the Corporation rejects an opportunity, by at least a majority vote of its Board of Directors, each Stockholder agrees to present to the Corporation, and not to divert for personal gain, any opportunity known to such Stockholder which may be of interest to the Corporation when (and only when) such opportunity is closely

18

associated with and related to the Corporation's present business of operating a grocery store directed and the Russian community in Essex County, including, without limitation, any opportunity growing out of a pre-existing relationship with the Corporation and any other opportunities which in equity or fairness belong to the Corporation.

4.5 Injunction. Each Stockholder agrees that a violation of the Stockholder's covenants in this Article 4 will cause such harm to the Corporation as will be irreparable, which harm cannot be adequately remedied solely by an action at law for money damages, and for that reason the Corporation shall be entitled as a matter of right to an injunction from any court of competent jurisdiction restraining any further violation. Such right to an injunction or restraining order shall not limit the availability of any other rights or remedies available to the Corporation. In the event of a judicial proceeding to enjoin a violation of a Stockholder's covenants, the term of the violated covenant shall be extended by the duration of the violation as determined in that proceeding.

## ARTICLE 5 - MISCELLANEOUS

5.1 Change in Shares. If there shall be any change in the Shares through merger, consolidation, reorganization, recapitalization, stock dividend, split-up, combination or exchange of shares, or the like, all of the terms and provisions of this Agreement shall apply to any new, additional or different shares or securities issued as a result of such event, and the Fair Value and the number of shares or other securities that may be purchased under this Agreement shall be appropriately adjusted by the Board of Directors.

5.2 Legend on Each Certificate. For as long as this Agreement is in effect, each stock certificate representing the Shares shall bear a legend as follows:

19

The shares of stock represented by this certificate are subject to rights of repurchase and restrictions on transfer and other provisions set forth in a Stockholders' Agreement dated as of January 18, 2008, as the same may be amended or restated from time to time, a copy of which will be furnished to any holder of this certificate by the Corporation upon written request and without charge therefor.

5.3 Term of Agreement. This Agreement shall commence as of the date hereof and shall terminate upon the earliest to occur of (a) the bankruptcy, receivership or dissolution of the Corporation; or (b) the beneficial ownership of all of the Shares by one Stockholder. Notwithstanding anything to the contrary contained herein, the termination of this Agreement pursuant to this Section 5.3 or otherwise shall not affect any rights or obligations of any party hereto which have arisen and vested prior to such termination including without limitation, such rights and obligations under Articles 2 and 4 hereof.

5.4 Notices. Except as otherwise provided herein, any offer, acceptance, election, notice or other communication required or permitted to be given pursuant to this Agreement shall be deemed to have been duly and sufficiently given for all purposes if in writing and (a) delivered personally to the party or to an officer, trustee or other representative of the party to whom such notice shall be directed or (b) sent by certified mail, postage prepaid, return receipt requested, if to the Corporation, at its principal place of business, or if to any of the Stockholders, at such Stockholder's home address or regular business address set forth in Exhibit A, or to such other address, including email address, as such party may designate to each of the other parties hereto by a notice complying with the requirements of this Section 5.4. Any such notice shall be deemed to have been given on the date of hand delivery or the date two (2) days after the date of mailing as aforesaid.

20

5.5 Further Action. The Stockholders and their Legal Representatives, if any, shall take such actions, individually and as officers, directors and stockholders, as the case may be, as may be necessary for the purpose of consummating any purchases and sales required or permitted pursuant to this Agreement and for effecting the terms hereof including, without limitation, obtaining any court authority or license required to effect any Transfer of the Shares of a Stockholder upon such Stockholder's death, Termination or Disability.

5.6 Entire Agreement; Amendments. This Agreement contains the entire agreement among the parties hereto with respect to the matters contemplated hereby, and no prior agreement, whether written or oral, shall be construed to modify or repeal this Agreement. This Agreement may be amended only by a written instrument executed in one or more counterparts by the Corporation and the holders of at least two-thirds of the Shares; provided, however, that any such amendment to this Agreement shall not affect the rights or obligations of any former Stockholder unless such former Stockholder has agreed or consented thereto in writing.

5.7 Equitable Remedies. Each Stockholder acknowledges that a remedy at law for any breach or threatened breach by such Stockholder of the provisions of this Agreement may be inadequate and that the Corporation (or any other Stockholder) shall be entitled to injunctive relief in the case of any such breach or threatened breach. Furthermore, each Stockholder hereby agrees that the Corporation (or any other Stockholder) shall have the right to set off and deduct against any amounts due hereunder by the Corporation (or any other Stockholder) to such Stockholder pursuant to Article 2 hereof the amount of any losses or damages actually suffered by the Corporation (or any other Stockholder) arising from any breach.

5.8 Jurisdiction; Arbitration; Costs. The Stockholders consent to the exclusive jurisdiction of any state or federal court of competent jurisdiction in the Commonwealth of Massachusetts in any

action, suit, or proceeding of any kind which arises out of or by reason of this Agreement;
provided, however, should any dispute arise between the parties hereto concerning this
Agreement, other than a dispute for which injunctive relief is the appropriate remedy as provided
in Sections 2.10, 4.5 and 5.7 of this Agreement, which disputes cannot be settled by the parties,
that dispute shall be settled by binding arbitration before the American Arbitration Association in
Boston, Massachusetts in accordance with the Commercial Arbitration Rules of that Association.
The written decision of the arbitrator(s) shall be conclusive and binding upon the parties and in
such form that judgment may be entered in and enforced by any court having jurisdiction over
the parties. The losing party shall pay the costs of any arbitration, including prompt
reimbursement to the prevailing party of reasonable attorneys' fees incurred in connection with
the arbitration. The arbitrators shall specify the prevailing and losing party, if any, in the
arbitration award. If more than one arbitrable dispute is arbitrated, then the costs and expenses of
the arbitration shall be apportioned by the arbitrators in the arbitration award to each separate
dispute.

5.9 Agreement to Employ. Except as specifically set forth herein, nothing contained in this
Agreement shall be construed to constitute or be evidence of any agreement or understanding,
express or implied, on the part of the Corporation to employ or retain any Stockholder for any
specific period of time or to limit the Corporation's ability to terminate the employment,
consulting arrangement or directorship of any Stockholder at any time, for any reason or no
reason. Notwithstanding the foregoing, the Corporation agrees to employ Eugene Pelikhov in
the following capacity as long as Mr. Pelikhov is a shareholder. Mr. Pelikhov's base salary shall
be $500.00 per week drawn from the Corporation's payroll account. Mr. Pelikhov shall also
receive an additional $500.00 per week drawn from the Corporation's operating account. The

Corporation can terminate Mr. Pelikhov only pursuant to his Termination For Cause, Disability, death or for material failure of the Stockholder to perform the usual daily job of operating the grocery store by failure to contribute a full-time effort of labor and time as currently performed by the Stockholder.

5.10 Binding Effect. This Agreement shall be binding upon, and inure to the benefit of, the parties hereto, their heirs, legal representatives, successors and assigns.

5.11 Waiver. No waiver hereunder shall be effective unless it is set forth in a written instrument executed by the party waiving a breach or default hereunder. No consent to or waiver of any breach or default in the performance of any obligation hereunder shall be deemed or construed to be a consent to or waiver of any other breach or default in the performance of the same or any other obligation hereunder. Failure on the part of any party to complain of any act or failure to act of any other party or to declare any other party in default of any obligation hereunder, irrespective of how long such failure continues, shall not constitute a waiver of rights hereunder.

5.12 Severability. If any provision of this Agreement shall, in whole or in part, prove to be invalid for any reason, such invalidity shall affect only the portion of such provision which shall be invalid and in all other respects this Agreement shall be effective as if such invalid provision, or the invalid portion thereof, had not been a part hereof. Without limiting the generality of the foregoing, if any one or more of the provisions contained in this Agreement shall for any reason be held to be excessively broad as to duration, geographical scope, activity or subject, such provision shall be construed by limiting and reducing it, so as to be enforceable to the extent compatible with the applicable law as it shall then appear.

23

5.13 Headings. The headings of sections and subsections of this Agreement have been inserted for convenience of reference only and shall not be deemed to affect the meaning of any of the provisions of this Agreement.

5.14 Governing Law. This Agreement and the rights and obligations of the parties hereto shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts, without regard for choice of law provisions.

5.15 Counterparts. This Agreement may be executed in one or more counterparts, each of which when executed shall be deemed an original and all of which, taken together, shall constitute one and the same instrument.

IN WITNESS WHEREOF, this Agreement has been executed by the parties hereto as an instrument under seal as of the date first set forth above.

STOCKHOLDERS: Gold and Farb, Inc.

_Lev Goldfarb_                 By: _Lev Goldfarb_

Lev Goldfarb                       Lev Goldfarb, President

_Alex Goldfarb_

Alexander Goldfarb

_Eugene Pelikhov_

Eugene Pelikhov

24

Exhibit A

## GOLD AND FARB, INC.

List of Stockholders

as of January ___, 2008

Stockholder and Address                          Number of Shares


Lev Goldfarb                                     500
6 Loring Hills Avenue, C-6
Salem, MA 01970


Alexander Goldfarb                               250
6 Loring Hills Avenue, C-6
Salem, MA 01970


Eugene Pelikhov                                  250
14 Orleans Avenue
Salem, MA 01970

Exhibit B

**GOLD AND FARB, INC.**

Instrument of Adherence

The undersigned, as a condition to becoming the owner or holder of shares of Common Stock, $0.01 par value per share, of Gold and Farb, Inc., a Massachusetts corporation (the "Corporation"), hereby agrees to become a party to that certain Stockholders' Agreement dated as of January /8, 2008, by and among the Corporation and its Stockholders (the "Stockholders' Agreement"), and to be deemed a "Stockholder" for the purposes of, and within the meaning contained in, the Stockholders' Agreement. The undersigned further agrees to be bound by all of the provisions of the Stockholders' Agreement. This Instrument of Adherence shall take effect and shall become a part of said Stockholders' Agreement immediately upon the execution by the undersigned.

Executed as a sealed instrument under the laws of the Commonwealth of Massachusetts.

Signature: _____

Name: _____

Address: _____

_____

Date: _____

Acknowledged and accepted:

GOLD AND FARB, INC.

By: _Lev Goldfarb_

Authorized Officer

Date: _____

26

Exhibit D

## GOLD AND FARB, INC.

Certificate of Fair Value

Pursuant to Section 2.6 of that certain Stockholders' Agreement dated as of January 18, 2008

by and among Gold and Farb, Inc. (the "Corporation"), and some or all of the stockholders of the

Corporation, the undersigned, being all of the Stockholders under that Stockholders' Agreement,

hereby severally and collectively agree that the fair value of the Common Stock, $0.01 par value

per share, of the Corporation is:

$ 700.00 per share.

Executed as of the 18 day of January, 2008.

STOCKHOLDERS:

_____

Lev Goldfarb

_____

Alexander Goldfarb

_____

Eugene Pelikhov

27

Exhibit D

**GOLD AND FARB, INC.**

Certificate of Fair Value

Pursuant to Section 2.6 of that certain Stockholders' Agreement dated as of January _18_, 2008

by and among Gold and Farb, Inc. (the "Corporation"), and some or all of the stockholders of the

Corporation, the undersigned, being all of the Stockholders under that Stockholders' Agreement,

hereby severally and collectively agree that the fair value of the Common Stock, $0.01 par value

per share, of the Corporation is:

$ 700.00 per share.

Executed as of the _18_ day of January, 2008.

STOCKHOLDERS:

_Lev Goldfarb_

Lev Goldfarb

_____

Alexander Goldfarb

_____

Eugene Pelikhov

27

Exhibit 2

466 Mass. 256
994 N.E.2d 790

**Jane B. McINNES**
**v.**
**LPL FINANCIAL, LLC, & another.**[1]

**SJC–11356.**

**Supreme Judicial Court of Massachusetts, Barnstable.**

**Submitted April 4, 2013.**
**Decided Aug. 12, 2013.**

Header ends here.
**Summaries:**

**Source: Justia**

Karl McGhee, a financial advisor at LPL Financial, acted as financial planner for Plaintiff. Plaintiff filed a complaint against McGhee and LPL, asserting claims for, inter alia, violations of Mass. Gen. Laws ch. 93A. Defendants moved for an order compelling the parties to proceed to arbitration due to an arbitration agreement signed by Plaintiff. The motion judge denied the motion, concluding that none of Plaintiff's claims could be compelled to arbitration because claimants under chapter 93A, section 9 are not required to submit to arbitration. The Supreme Court reversed, holding (1) claims alleging an unfair or deceptive trade practice in violation of chapter 93A, section 9 must be referred to arbitration where the contract involves interstate commerce and the agreement is enforceable under the Federal Arbitration Act (FAA); and (2) because Plaintiff and Defendants in this case entered into a valid contract whereby they agreed to settle all controversies related to Plaintiff's financial account by arbitration, and because the arbitration agreement was governed by the FAA, Defendants as a matter of law were entitled under the FAA to a stay of judicial proceedings and an order compelling arbitration. Remanded.

[994 N.E.2d 792]

Thomas J. Carey, Jr. (Michael A. Collora & Justin P. O'Brien, Boston, with him) for the defendant.

Bruce A. Bierhans, Easton, for the plaintiff.

John Pagliaro & Martin J. Newhouse for New England Legal Foundation & another, amici curiae, submitted a brief.

John R. Snyder & S. Elaine McChesney, for American Financial Services Association, amicus curiae, submitted a brief.

**Present: IRELAND, C.J., SPINA, BOTSFORD, GANTS, DUFFLY, & LENK, JJ.**

**GANTS, J.**

[466 Mass. 257]In *Hannon v. Original Gunite Aquatech Pools, Inc.*, 385 Mass. 813, 826–827, 434 N.E.2d 611 (1982)( *Hannon* ), we held that, even where a consumer executed a valid contract agreeing to arbitrate all disputes, a plaintiff may not be compelled to arbitrate a claim alleging an unfair or deceptive trade practice in violation of G.L. c. 93A, § 9. We hold today that such claims must be referred to arbitration where the contract involves interstate commerce and the agreement to arbitrate is enforceable under the Federal Arbitration Act, 9 U.S.C. §§ 1 et seq. (2006) (FAA). Because the plaintiff and defendants in this case entered into a valid contract in which they agreed to settle all controversies related to the plaintiff's financial account by arbitration, and because the arbitration agreement is governed by the FAA, we conclude that the motion judges erred in declining to stay judicial proceedings

fastcase

and order the matter to proceed to arbitration.[2]

*Background.* In September, 2011, the plaintiff, Jane B. McInnes, filed a complaint in Superior Court, asserting claims against LPL Financial, LLC (LPL), and Karl G. McGhee, Jr., for fraud; intentional misrepresentation; breach of fiduciary duty; intentional infliction of emotional distress; and violations of G.L. c. 110A, § 410 (Uniform Securities Act), and G.L. c. 93A (consumer protection act).[3] As alleged

[994 N.E.2d 793]

in the plaintiff's complaint, McGhee was a financial advisor, registered broker, [466 Mass. 258]and manager at LPL, who assumed the role of financial planner for the plaintiff. In 1998, after conducting an analysis of the plaintiff's investment portfolio, McGhee represented that a variable universal life insurance policy (policy) with a face value of $2,000,000 was a suitable investment for her. Relying on McGhee's "knowledge, expertise and representations," the plaintiff purchased the policy. Although she had an annual fixed income of only approximately $30,000, the plaintiff paid a total of $330,173.97 in premiums on the policy between July, 1998, and July, 2006. In 2000, unbeknownst to the plaintiff, McGhee established an irrevocable trust in the plaintiff's name, and identified himself as the both the owner and trustee of the policy. In May, 2009, McGhee informed the plaintiff that the policy was going to lapse in June because the outstanding indebtedness exceeded the cash value of the policy, and told her that he was going to sell the policy to prevent it from lapsing. In November, the plaintiff met with a new financial advisor who, after analyzing the policy and the plaintiff's investment portfolio, informed her that the policy was never a suitable investment for her, had lapsed in June, and retained no value.

The defendants moved pursuant to G.L. c. 251, § 2, of the Massachusetts Arbitration Act (MAA), for a stay of the court proceedings and an order compelling the parties to proceed to arbitration. The motion was supported by McGhee's affidavit, where he attested that the plaintiff opened a brokerage and individual retirement account at LPL in 1996, and signed the "opening account" forms that required the parties to elect to [466 Mass. 259]resolve any dispute in arbitration. Neither he nor LPL could locate these forms. However, he was able to locate in LPL's files a new account application and agreement, signed by the plaintiff on February 7, 2003, where in bold print directly above her signature, it states: "I further certify ... that I have reviewed and accept the Master Account Agreement and the Pre–Dispute Arbitration Agreement stated in the last section of the Master Account Agreement." The "Pre–Dispute Arbitration Agreement" (arbitration agreement) provides, in pertinent part:

"In consideration of opening one or more accounts for you, you agree that any controversy between LPL arising out of or relating to your account, transactions with or for you, or the construction, performance, or breach of this agreement whether entered into prior, on or subsequent to the date hereof, shall be settled by arbitration in accordance with the rules, then obtaining of the National Association of Securities Dealers, Inc." [4]

[994 N.E.2d 794]

The judge denied the motion, concluding that "notwithstanding the [a]rbitration [a]greement, none of Plaintiff's claims can be compelled to arbitration." Relying on *Hannon, supra* at 816, 434 N.E.2d 611, the judge stated that the arbitration agreement cannot be enforced because claimants under G.L. c. 93A, § 9, are not required to submit to arbitration, and the plaintiff's other claims, both at common law and pursuant to G.L. c. 110A, § 410, all arise from McGhee's alleged



conduct as a financial planner and are "inexorably intertwined with her [G.L. c.] 93A claim."

The defendants subsequently filed a second motion to stay proceedings and compel arbitration, this time arguing that the arbitration agreement is governed by the FAA and that the FAA, under the doctrine of Federal preemption, requires enforcement of arbitration agreements regardless of State statutes or judicial decisions that declare them unenforceable. A different judge denied this motion after hearing, finding that, "[t]here remains a viable issue as to whether the arbitration clause 1) exists (the original agreement cannot be found) and 2) was obtained by [466 Mass. 260]fraud." 5 The defendants exercised their entitlement to an interlocutory appeal from an order denying an application to compel arbitration, and appealed both orders. See G.L. c. 251, §§ 2, 18; *Warfield v. Beth Israel Deaconess Med. Ctr., Inc.*, 454 Mass. 390, 395, 910 N.E.2d 317 (2009)( *Warfield* ). We granted their application for direct appellate review.

*Discussion.* 1. *Legal framework.* Before we address the orders denying the defendants' motion to stay proceedings and compel arbitration, we set forth the legal framework that governs such motions. Arbitration agreements in Massachusetts are governed by the MAA, G.L. c. 251, §§ 1 et seq., and where the contract involves a transaction affecting interstate commerce, by the FAA, 9 U.S.C. §§ 1 et seq. See *Warfield, supra* at 394, 910 N.E.2d 317. "In all relevant respects, the language of the FAA and the MAA providing for enforcement of arbitration provisions are similar, and we have interpreted the cognate provisions in the same manner." *Id.,* citing *Miller v. Cotter*, 448 Mass. 671, 678–679, 863 N.E.2d 537 (2007)( *Miller* ). Under both G.L. c. 251, § 1, and 9 U.S.C. § 2 (2006), a written agreement (or provision in a written agreement) to submit to arbitration any dispute between the parties, whether existing or arising in the future, "shall be valid ... save

upon such grounds as exist at law or in equity for the revocation of any contract." 6 Under these statutory provisions, where the parties have executed an arbitration agreement and the agreement [466 Mass. 261]is not invalid on legal or equitable grounds, the agreement to arbitrate is enforceable

[994 N.E.2d 795]

against the parties. See *AT&T Mobility LLC v. Concepcion*, ––– U.S. ––––, 131 S.Ct. 1740, 1745–1746, 179 L.Ed.2d 742 (2011). See also *Miller, supra*.

Where a party denies the existence of a valid agreement to arbitrate, either because the party denies that it entered into such an agreement or because it challenges the validity of such an agreement, the MAA's procedures set forth in G.L. c. 251, § 2, govern the adjudication of a motion to compel arbitration. *Warfield, supra* at 395, 910 N.E.2d 317.*St. Fleur v. WPI Cable Sys./Mutron*, 450 Mass. 345, 352, 879 N.E.2d 27 (2008)( *St. Fleur* ).7Section 2 ( *a* ) provides:

"A party aggrieved by the failure or refusal of another to proceed to arbitration under an agreement described in section one may apply to the superior court for an order directing the parties to proceed to arbitration. If the opposing party denies the existence of the agreement to arbitrate, the court shall proceed summarily to the determination of the issue so raised and shall, if it finds for the applicant, order arbitration; otherwise, the application shall be denied." To "proceed summarily" means "that a judge determines whether there is a dispute as to a material fact; and, if there is not such a dispute, the judge resolves the issue as a matter of law; but, if there is such a dispute, the judge conducts an expedited evidentiary hearing on the matter and then decides the issue." *St. Fleur, supra* at 353, 879 N.E.2d 27.8 See *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84, 123 S.Ct. 588, 154



L.Ed.2d 491 (2002) ("a gateway dispute about whether [466 Mass. 262]the parties are bound by a given arbitration clause raises a 'question of arbitrability' for a court to decide").

Although the MAA governs the procedures to be applied where an issue arises regarding the arbitrability of a dispute, where the underlying contract affects interstate commerce, the arbitration agreement is governed by the FAA and the substantive law to be applied is Federal. See *Southland Corp. v. Keating*, 465 U.S. 1, 12, 104 S.Ct. 852, 79 L.Ed.2d 1 (1984), quoting *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 25 & n. 32, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983) (FAA "creates a body of federal substantive law" that is applicable in both State and Federal court). See also *Preston v. Ferrer*, 552 U.S. 346, 349, 128 S.Ct. 978, 169 L.Ed.2d 917 (2008) (FAA "rests on Congress' authority under the Commerce Clause" and "calls for the application, in state as well as federal courts, of federal substantive law regarding arbitration"); *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 445–446, 126 S.Ct. 1204, 163 L.Ed.2d 1038 (2006).

[994 N.E.2d 796]

Under substantive Federal arbitration law, the so-called "saving clause" of 9 U.S.C. § 2, which permits arbitration agreements to be declared unenforceable "upon such grounds as exist at law or in equity for the revocation of any contract," allows "agreements to arbitrate to be invalidated by 'generally applicable contract defenses, such as fraud, duress, or unconscionability,' but not by defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue." *AT&T Mobility LLC v. Concepcion, supra* at 1746, quoting *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996). In applying the saving clause, a judge must sever the arbitration provision

from the remainder of the contract, and determine the validity of the arbitration provision itself, leaving the validity of the remainder of the contract (if the arbitration provision is valid) to be decided by the arbitrator. *Nitro–Lift Techs., L.L.C. v. Howard*, ––– U.S. ––––, 133 S.Ct. 500, 503, 184 L.Ed.2d 328 (2012); *Buckeye Check Cashing, Inc. v. Cardegna, supra* at 445–446, 126 S.Ct. 1204. "Although § 2's saving clause preserves generally applicable contract defenses, nothing in it suggests an intent to preserve state-law rules that stand as an obstacle to the accomplishment of the FAA's objectives." *AT&T Mobility LLC v. Concepcion, supra* at 1748. "When state law prohibits outright the arbitration of a particular type of claim, the analysis is straightforward: [466 Mass. 263]The conflicting rule is displaced by the FAA." *Id.* at 1747. See *Nitro–Lift Techs., L.L.C. v. Howard, supra* at 504 (where specific State statute conflicts with FAA, FAA preempts State statute through supremacy clause, U.S. Const., art. VI, cl. 2). See also *Marmet Health Care Ctr., Inc. v. Brown*, ––– U.S. ––––, 132 S.Ct. 1201, 1203–1204, 182 L.Ed.2d 42 (2012) ("West Virginia's prohibition against predispute agreements to arbitrate personal-injury or wrongful-death claims against nursing homes is a categorical rule prohibiting arbitration of a particular type of claim, and that rule is contrary to the terms and coverage of the FAA"); *Miller, supra* at 678–79, 863 N.E.2d 537 ("those State acts that seek to limit the enforceability of arbitration contracts are preempted by the Federal Act").

2. *First order.* In denying the defendants' first motion to stay proceedings and compel arbitration, the judge relied on controlling precedent in *Hannon, supra* at 826–827, 434 N.E.2d 611, where this court held that, even where the contractual parties agreed to arbitrate all disputes, a judge may not compel a plaintiff to arbitrate a claim of an unfair or deceptive act or practice in violation of G.L. c. 93A, § 9. The court in



Hannon, supra at 826, 434 N.E.2d 611, concluded that the Legislature intended to preclude an order staying judicial proceedings and compelling arbitration of these claims by its enactment of G.L. c. 93A, § 9(6), inserted by St. 1973, c. 939, which states, in pertinent part:

"Any person entitled to bring an action under [G.L. c. 93A, § 9,] shall not be required to initiate, pursue or exhaust any remedy established by any regulation, administrative procedure, local, state or federal law or statute or the common law in order to bring an action under [§ 9] or to obtain injunctive relief or recover damages or attorney's fees or costs or other relief as provided in this section."

While the court recognized that "arbitration pursuant to a contract does not fall neatly into the categories of remedies listed in G.L. c. 93A, § 9(6)," the court concluded that arbitration was "comprehended within either 'common law' or statutory remedies." Hannon, supra. Even though

[994 N.E.2d 797]

the underlying contract that included the arbitration provision concerned the construction of an in-ground swimming pool, and may have involved interstate commerce, the court in Hannon made no reference to the FAA, or to whether Federal substantive law under the FAA [466 Mass. 264]should govern the arbitrability of these claims. Id. at 814, 826–827, 434 N.E.2d 611. We need not decide whether the Hannon opinion correctly interpreted G.L. c. 93A, § 9(6), or correctly understood that the Legislature intended through its enactment to preclude a court from compelling arbitration of a consumer claim under G.L. c. 93A, § 9, because even if § 9(6) had explicitly prohibited a court from compelling arbitration of a § 9 claim where the parties had agreed to arbitrate such claims, the State law would be in conflict with and displaced by the FAA, and could not

apply to any arbitration agreement governed by the FAA. See, e.g., Nitro–Lift Techs., L.L.C. v. Howard, supra at 504;AT&T Mobility LLC v. Concepcion, supra at 1747.

Here, there is no dispute that the underlying financial services contract between the plaintiff and the defendants involved interstate commerce, where, according to the complaint, the plaintiff resides in Massachusetts and McGhee worked in Pennsylvania as a financial advisor for LPL. See Miller, supra at 678, 863 N.E.2d 537, and cases cited. See also Loche v. Dean Witter Reynolds, Inc., 26 Mass.App.Ct. 296, 302, 526 N.E.2d 1296 (1988) ("Contracts whose very purpose is to create a relationship for the purchase and sale of securities almost necessarily will involve interstate commerce"). Therefore, any arbitration agreement between them was governed by the FAA. Because our holding in Hannon does not apply to any arbitration agreement governed by the FAA, the judge erred in relying on that holding to deny the defendants' first motion to stay proceedings and compel arbitration.[9]

3. Second order. In denying the defendant's second motion to stay proceedings and compel arbitration, the judge essentially treated the motion as if it sought summary judgment on the issue of arbitrability of the dispute and denied it because he concluded that material disputes of fact remained as to whether the plaintiff had entered into an arbitration agreement in 1996 and whether any such agreement had been obtained by fraud. In so ruling, the judge made two errors.

[466 Mass. 265]First, if there were material disputes of fact that prevented the judge from ruling on the motion based on the evidence submitted, the judge, rather than deny the motion, should have ordered an expedited evidentiary hearing to resolve the



-5-

disputed issues of fact so that he could summarily determine whether the claims should be resolved by an arbitrator or by a court. See *St. Fleur, supra* at 353, 879 N.E.2d 27.

Second, based on the undisputed evidence before the judge, the judge should have allowed the motion to compel arbitration. The plaintiff's complaint was not verified, and the plaintiff did not submit an affidavit in opposition to the motion or any other evidence. Consequently, the only evidence before the judge was McGhee's affidavit and the exhibits he appended to that affidavit, including the new account application signed by the plaintiff in 2003 in which she certified that she accepted the arbitration agreement in the master account agreement. Under that

[994 N.E.2d 798]

arbitration agreement, the plaintiff agreed to resolve through arbitration "any controversy between LPL arising out of or relating to [her] account, transactions with or for [her], or the construction, performance, or breach of this agreement *whether entered into prior, on or subsequent to the date hereof* " (emphasis added). Even if the plaintiff had not executed an arbitration agreement in 1996 when she first opened an account with LPL, her agreement to arbitrate in 2003 required arbitration of all disputes regarding the defendants' financial advice and transactions concerning her account, regardless of whether that advice was given or those transactions occurred before or after she executed the 2003 arbitration agreement. Therefore, there was no dispute of fact that the plaintiff had executed an arbitration agreement with the defendants that applied to the claims alleged in her complaint. See *Granite Rock Co. v. International Bhd. of Teamsters,* --- U.S. - ---, 130 S.Ct. 2847, 2856, 177 L.Ed.2d 567 (2010) ("court may order arbitration of a particular dispute only where the court is

satisfied that the parties agreed to arbitrate that dispute").

Nor was there any evidence before the judge that the arbitration agreement was obtained by fraud or was otherwise void or voidable. As noted earlier, under Federal substantive law, an arbitration agreement may be found invalid where it was fraudulently obtained, but in making this determination, the [466 Mass. 266]judge must sever the arbitration provision from the remainder of the contract, and determine whether the arbitration provision was obtained by fraud, not whether the entire contract was obtained by fraud. See *Nitro–Lift Techs., L.L.C. v.Howard,* --- U.S. ----, 133 S.Ct. 500, 503, 184 L.Ed.2d 328 (2012); *Buckeye Check Cashing, Inc. v. Cardegna,* 546 U.S. 440, 445–446, 126 S.Ct. 1204, 163 L.Ed.2d 1038 (2006). The plaintiff's complaint alleges fraudulent conduct by McGhee but does not allege that her agreement to arbitrate was itself the product of fraud or duress, or that the arbitration provision itself is unconscionable or against public policy. Even if we put aside the fact that her allegations supporting a claim of fraud in the inducement are neither particularized nor verified, see Mass R. Civ. P. 9(b), 376 Mass. 751 (1974), the most that can be inferred from the complaint is that the arbitration provision was a contract of adhesion, but this alone is insufficient to render an arbitration agreement invalid. "[C]ontracts [of adhesion] are enforceable unless they are unconscionable, offend public policy, or are shown to be unfair in the particular circumstances." *Miller, supra* at 684 n. 16, 863 N.E.2d 537, quoting *Chase Commercial Corp. v. Owen,* 32 Mass.App.Ct. 248, 253, 588 N.E.2d 705 (1992). See *AT&T Mobility LLC v. Concepcion,* --- U.S. ----, 131 S.Ct. 1740, 1750 n. 6, 179 L.Ed.2d 742 (2011) ( "States remain free to take steps addressing the concerns that attend contracts of adhesion.... Such steps cannot, however, conflict with the FAA or frustrate its purpose to ensure that private arbitration agreements



are enforced according to their terms"). Certainly, an adhesion contract to arbitrate that contains a "prospective waiver of a party's *right to pursue* statutory remedies" could be unenforceable as unconscionable or against public policy (emphasis in original). See *American Express Co., v. Italian Colors Restaurant,* ---U.S. ----, 133 S.Ct. 2304, 2310, 186 L.Ed.2d 417 (2013), quoting *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 637 n. 19, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985). And an adhesion contract that imposes "filing and administrative fees attached to arbitration that are so high as to make access to the forum impracticable"

[994 N.E.2d 799]

may also be unenforceable. *American Express Co., v. Italian Colors Restaurant, supra* at 2310–2311. But the plaintiff has not demonstrated that she effectively will be prevented from pursuing a remedy if she is compelled to arbitrate, because she waived no statutory or common-law remedy in the arbitration [466 Mass. 267]agreement, the amount of the arbitration fees would not make access to the arbitral forum impracticable in view of the substantial amount in compensatory damages that she claims (more than $330,000),[10] and the arbitrator would have the same power as a court to award compensatory damages, attorney's fees, and multiple damages if the plaintiff were to prevail on her claim under G.L. c. 93A, § 9. See *Preston v. Ferrer,* 552 U.S. 346, 359, 128 S.Ct. 978, 169 L.Ed.2d 917 (2008), quoting *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc., supra* at 628, 105 S.Ct. 3346 ("By agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral ... forum"); *Drywall Sys., Inc. v. ZVI Constr. Co.,* 435 Mass. 664, 669, 761 N.E.2d 482 (2002).

Because there is no dispute of material fact as to whether the plaintiff executed a valid arbitration agreement in 2003 that required the plaintiff to arbitrate the claims in her complaint, the defendants as a matter of law are entitled under the FAA to a stay of judicial proceedings and an order compelling arbitration.

*Conclusion.* We vacate the orders denying the defendants' motions to stay proceedings and compel arbitration, and remand the case to the Superior Court for the entry of an order consistent with this opinion staying the judicial proceeding and compelling arbitration.

*So ordered.*

--------

Notes:

[1] Karl G. McGhee, Jr. A suggestion of his death was filed in this court on March 28, 2013.

[2] We acknowledge the amicus briefs of American Financial Services Association, and New England Legal Foundation and Associated Industries of Massachusetts.

[3] The complaint alleges a violation of G.L. c. 93A, § 11, which provides a civil remedy to "[a]ny person who engages in the conduct of any trade or commerce and who suffers any loss of money or property ... as a result of the use or employment by another person who engages in any trade or commerce of an unfair method of competition or an unfair or deceptive act or practice declared unlawful by [G.L. c. 93A, § 2]." However, the plaintiff's demand letter that preceded the filing of the complaint alleged a violation of G.L. c. 93A, § 9, which is the comparable claim brought by a plaintiff who is not herself engaged in the conduct of trade

or commerce. Because the plaintiff alleged in her complaint that the defendants were engaged in trade or commerce in the Commonwealth but did not allege that she was engaged in trade or commerce, we understand the complaint to allege a violation of § 9, not § 11. See *Santana v. Registrars of Voters of Worcester*, 384 Mass. 487, 491, 425 N.E.2d 745 (1981), S.C.,390 Mass. 353, 455 N.E.2d 1200 (1983) (complaint sufficient if plaintiff entitled to any form of relief, even if specific relief demanded inappropriate).

4. The National Association of Securities Dealers, Inc. is the predecessor organization to the Financial Industry Regulatory Authority, Inc. (FINRA).

5. The judge did not explain his findings in a written decision, and we do not know whether he orally explained them because the record does not include a transcript of the hearing on this motion.

6.General Laws c. 251, § 1, provides, in pertinent part:

"A written agreement to submit any existing controversy to arbitration or a provision in a written contract to submit to arbitration any controversy thereafter arising between the parties shall be valid, enforceable and irrevocable, save upon such grounds as exist at law or in equity for the revocation of any contract."

Title 9 U.S.C. § 2 (2006) provides, in pertinent part:

"A written provision in ... a contract evidencing a transaction involving [interstate] commerce to settle by arbitration a controversy thereafter arising out of such contract, ... or the refusal to perform the

whole or any part thereof ... shall be valid, irrevocable and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."

7. The procedural counterpart under the Federal Arbitration Act, 9 U.S.C. § 4 (2006), provides that "[a] party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court" and, therefore, does not apply to a motion to compel arbitration brought in a Massachusetts State court. See *St. Fleur v. WPI Cable Sys./Mutron*, 450 Mass. 345, 351–352, 879 N.E.2d 27 (2008).

8. "The absence of a right to a jury trial in these circumstances is consistent with a party's rights in nonarbitration contractual disputes. A motion to compel arbitration is in essence a suit in equity to compel specific performance of an arbitration agreement.... Typically, there is no right to a jury trial for actions seeking specific performance of a contract or for actions challenging the existence of a contract on the ground of fraudulent inducement.... However, a judge, in her discretion, may grant a jury trial." (Citations and footnotes omitted.) *St. Fleur v. WPI Cable Sys./Mutron*, *supra* at 353, 879 N.E.2d 27.

9. Because the contract here involved interstate commerce, we do not address whether claims under G.L. c. 93A, § 9, must be referred to arbitration where the contract includes an agreement to arbitrate but does not involve interstate commerce and, therefore, falls outside the scope of the Federal Arbitration Act, 9 U.S.C. §§ 1 et seq. (2006).

fast

10. The "Pre–Dispute Arbitration Agreement" accepted by the plaintiff on February 7, 2003, does not directly refer to arbitration fees but provides that the arbitration shall be conducted in accordance with "the rules, then obtaining of the National Association of Securities Dealers, Inc.," now FINRA. See note 4, *supra*. Under rule 12900(a)(1) of FINRA's Code of Arbitration Procedure for Customer Disputes, in the FINRA Manual (2012), unless the director of FINRA dispute resolution defers all or part of the filing fee "on a showing of financial hardship," a party filing an arbitration must pay a filing fee in an amount based on the total amount of the claim, including any requested punitive and treble damages. In this case, where such an amount would exceed $1 million, the filing fee would be $1,800. Pursuant to rule 12900(d), the arbitrator may order another party to reimburse a party for all or part of the filing fee paid. Under rule 12902(a)(1), the parties to an arbitration must also pay a "hearing session fee" for each hearing session, which here would be $450 per hearing session with one arbitrator and $1,200 per hearing session with a panel of three arbitrators. Rule 12902(b) states that the arbitrator or panel of arbitrators may assess the hearing session fee in the arbitration award or require the parties to pay the fees during the course of the arbitration.



*10.1*

## COMMONWEALTH OF MASSACHUSETTS

**Essex, SS.**

Eugene Pelikhov,

    Plaintiff,

v.

Gold and Farb, Inc.,
Lev Goldfarb,
Alexander Goldfarb, and
Lydmila Rogalin

    Defendants.

**Trial Court Division
Essex Superior Court
Civil Action No.:
1577CV01902A**

## <u>DECLARATION OF VALENTIN GURVITS IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO COMPEL ARBITRATION AND TO STAY THE PROCEEDING</u>

I, Valentin Gurvits, do declare as follows:

    1.    My name is Valentin Gurvits.  I am over the age of 18 and am a Member of the

Bar of the Commonwealth of Massachusetts.  I am counsel of record for Plaintiff Eugene

Pelikhov in the above captioned case.

    2.    On March 17, 2016, I caused to be served on counsel for Defendants on behalf of

Plaintiff a large set of discovery requests, including Requests for Production of Documents to

each of the Defendants, Interrogatories to each of the Defendants and Requests for Admissions

to Defendant Gold and Farb, Inc.

    3.    On or about March 31, 2016, Defendants' counsel served me with Gold and Farb,

Inc.'s responses to the requests for admissions.

    4.    On March 17, 2016, I caused to be served on counsel for Defendants pursuant to

Superior Court Rule 9A and on behalf of Plaintiff, Plaintiff's Motion for Partial Judgement on

1

the Pleadings on Count XI Pursuant to M.G.L. Ch. 165D, Section 16.04 or, in the Alternative,

Motion to Compel Access to Corporate Records.

5.    Counsel for Defendants served an opposition to that Motion on March 28, 2016.

6.    I caused that Motion to be filed on the Court on April 6, 2016.

I hereby declare under the penalty of perjury that the foregoing is true and correct.

Valentin Gurvits, Esq.

Dated: April 6, 2016

**Certificate of Service**

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by first class mail on April 6, 2016.

Val Gurvits, Esq.

2

*10.2*

COMMONWEALTH OF MASSACHUSETTS

Essex, ss.

_____

EUGENE PELIKHOV,                                    Trial Court Division
                                                    Essex Superior Court
                Plaintiff                           Civil Action No. 1577CV01902A


vs.


GOLD AND FARB, INC.
LEV GOLDFARB
ALEXANDER GOLDFARB, AND
LYDMILA ROGALIN,

                Defendants

_____


## AFFIDAVIT OF COMPLIANCE UNDER RULE 9A

_____

        I, Vladimir von Timroth, attorney for the Defendants, Gold and Farb, Inc., Lev
Goldfarb, Alexander Goldfarb and Lydmila Rogalin, hereby file the attached *Defendants'
Motion to Compel Arbitration and to Stay the Proceeding* and state, pursuant to Superior
Court Rule 9A, that on March 24, 2016 , a copy of the within Motion was sent to all
counsel of record.   On April 8, 2016, I received *Plaintiff's Opposition to Defendants'
Motion to Compel Arbitration and to Stay the Proceeding* which is being filed herewith.

        Signed under the pains and penalties of perjury this 13th day of April, 2016.


                                        _____
                                        Vladimir von Timroth BBO #643553

*10.3*

COMMONWEALTH OF MASSACHUSETTS

Essex, ss.

_____

EUGENE PELIKHOV,                           Trial Court Division
                                           Essex Superior Court
            Plaintiff                      Civil Action No. 1577CV01902A


vs.

GOLD AND FARB, INC.
LEV GOLDFARB
ALEXANDER GOLDFARB, AND
LYDMILA ROGALIN,

            Defendants

_____


## LIST OF DOCUMENTS
_____


1. Defendants' Motion to Compel Arbitration and to Stay the Proceeding;
2. Plaintiff's Opposition to Defendants' Motion to Compel Arbitration and to Stay the
   Proceeding;
3. Affidavit of Compliance;
4. List of Documents; and,
5. Certificate of Service.


                          Respectfully submitted,
                          GOLD AND FARB, INC.,
                          LEV GOLDFARB,
                          ALEXANDER GOLDFARB and
                          LYDMILA ROGALIN
                          By their counsel:



                          _____
                          Vladimir von Timroth, Esq. BBO #643553
                          Law Office of Vladimir von Timroth
                          405 Grove Street, Suite 204
                          Worcester, MA 01605
                          Telephone: 508-756-2006
                          Facsimile: 774-221-9146
                          vontimroth@gmail.com

Dated: April 13, 2016

*10.9*

COMMONWEALTH OF MASSACHUSETTS

Essex, ss.

EUGENE PELIKHOV,                                    Trial Court Division
                                                    Essex Superior Court
                        Plaintiff                   Civil Action No. 1577CV01902A

vs.

GOLD AND FARB, INC.
LEV GOLDFARB
ALEXANDER GOLDFARB, AND
LYDMILA ROGALIN,

                        Defendants

CERTIFICATE OF SERVICE

I, Vladimir von Timroth, counsel for the Defendants, hereby certify that on this 13th day of April,
2016, I served a copy of the following by mailing the same, first-class mail, postage prepaid to
Plaintiff's counsel on record:

1. Defendants' Motion to Compel Arbitration and to Stay the Proceeding;
2. Plaintiff's Opposition to Defendants' Motion to Compel Arbitration and to Stay the
   Proceeding;
3. Affidavit of Compliance;
4. List of Documents; and,
5. Certificate of Service.

_____
Vladimir von Timroth, Esq. BBO #643553
Law Office of Vladimir von Timroth
405 Grove Street, Suite 204
Worcester, MA 01605
Telephone: 508-756-2006
Facsimile: 774-221-9146
vontimroth@gmail.com

Eugene Pelikov
c/o Matthew Shayefar, Esq.
Valentin David Gurvits, Esq.
Boston Law Group, PC
825 Beacon St., Suite 20
Newton Centre, MA 02459

# VLADIMIR VON TIMROTH, ESQ.

ATTORNEY AT LAW
405 Grove Street, Suite 204
Worcester, MA 01605

Telephone (508) 753 2006                    Facsimile (774) 221 9146

April 13, 2016

Essex County Superior Court
Clerk's Office
56 Federal Street
Salem, MA 01970

Re:    Eugene Pelikov vs. Gold and Farb, Inc. et. al.
       Civil action #: 1577CV01902  A

Dear Sir/Madam:

Pursuant to Superior Court Rule 9A, enclosed please find the following:

1.    Defendants' Motion to Compel Arbitration and to Stay the Proceeding;
2.    Plaintiff's Opposition to Defendants' Motion to Compel Arbitration and to Stay
      the Proceeding;
3.    Affidavit of Compliance;
4.    List of Documents; and,
5.    Certificate of Service.

                                        Sincerely,

                                        Vladimir von Timroth

Encl.
Cc:    Matthew Shayefar, Esq.
       Valentin David Gurvits, Esq.

## COMMONWEALTH OF MASSACHUSETTS

**Essex, SS.**

Eugene Pelikhov,

    Plaintiff,

v.

Gold and Farb, Inc.,
Lev Goldfarb,
Alexander Goldfarb, and
Lydmila Rogalin

    Defendants.

**Trial Court Division
Essex Superior Court
Civil Action No.:
1577CV01902A**

## PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO COMPEL ARBITRATION AND TO STAY THE PROCEEDING

Plaintiff Eugene Pelikhov, by and through undersigned counsel, hereby opposes

Defendants' Motion to Compel Arbitration and to Stay the Proceedings. As explained in detail

below, the Motion to Compel and Stay should be denied for numerous reasons, including

because (1) the arbitration clause does not apply in this case since Plaintiff is seeking injunctive

remedies, (2) the majority of the claims set forth in the Complaint are not covered by the

arbitration clause, (3) the arbitration clause does not apply to one of the Defendants at all, and (4)

Defendants waived their right to arbitration and Plaintiff would be unfairly prejudiced if

arbitration was compelled at this stage of the litigation.

## I.    Background

The Goldfarb family (a husband, wife and son) lured Plaintiff into investing $175,000

into 25% of their business and subsequently froze him out of the business, breached their

contractual and fiduciary obligations to him and otherwise denied him the rights and benefits to

1

which he is entitled. *Complaint*, ¶ 1. On or about January 18, 2008, Defendant Gold and Farb, Inc. ("GFI"), Defendant Lydmila Rogalin, and Plaintiff Eugene Pelikhov entered into a Purchase and Sale Agreement (the "P&S") whereby Ms. Rogalin sold Mr. Pelikhov 25% of the shares in GFI for $175,000. *Id.*, ¶¶ 9-10 and Exhibit 1 thereto. The P&S contained provisions entitling Mr. Pelikhov to employment with GFI and a seat on the Board of Directors of GFI. P&S, §§ 6(a) and (b).

On the same date, Mr. Pelikhov entered into a Stockholders' Agreement with GFI, Lev Goldfarb and Alexander Goldfarb. *Complaint*, ¶ 13 and Exhibit 6 thereto. Defendant Ms. Rogalin is not a party to the Stockholders' Agreement. The Stockholders' Agreement contains a limited arbitration clause (the "Arbitration Clause"), which states in pertinent part (emphasis added):

> [S]hould any dispute arise between the parties hereto concerning this Agreement, ***other than a dispute for which injunctive relief is the appropriate remedy as provided in Sections 2.10, 4.5 and 5.7 of this Agreement***, which disputes cannot be settled by the parties, that dispute shall be settled by binding arbitration before the American Arbitration Association in Boston, Massachusetts in accordance with the Commercial Arbitration Rules of that Association.

Section 2.10 of the Stockholders' Agreement provides that "No stockholder shall have the right or power to sell or assign any Shares except in strict compliance with the terms and conditions set forth in this Agreement," referencing the limitations on the parties of alienating ownership interests in GFI set forth in Article 2. Section 4.5 of the Stockholders' Agreement provides for injunctive relief in cases of breach of Article 4, which includes provisions against competition with GFI and provisions against diverting corporate opportunities for personal gain. Section 5.7 of the Stockholders' Agreement provides generally for equitable remedies for any breach of the Stockholders' Agreement.

Following Mr. Pelikhov's purchase into GFI, Mr. Pelikhov alleges that Defendants engaged in numerous bad acts, including, *inter alia*, breaches of the P&S and Stockholders' Agreement, freezing Mr. Pelikhov out of GFI, verbally abusing and berating Mr. Pelikhov, constructively terminating his employment with GFI, causing emotional distress, mental anguish and other personal injury, failing to properly account for cash sales and misappropriating those funds for their own personal benefit rather than for GFI (and ultimately Mr. Pelikhov), and failing to give Mr. Pelikhov access to records to which he was entitled by law. *Complaint*, ¶¶ 19-38. As is evident from the Complaint, Defendants have gone to any lengths to put off providing Mr. Pelikhov any information about the business that he bought into and has a right to manage and be a part of.

On the basis of these bad acts, Mr. Pelikhov filed suit against Defendants for numerous causes of action, almost all of which arise not from the Stockholders' Agreement, but on other bases. Those causes of action completely separate from the Stockholders' Agreement are for Piercing the Corporate Veil (Count I), Breach of Fiduciary Duty (Count II), Unjust Enrichment (Count V), Fraudulent Misrepresentation (Count VI), Embezzlement (Count VII), Conversion (Count VIII), Civil Conspiracy (Count IX), Accounting (X) and violation of M.G.L. Chapter 156D, Section 16.04 (Count XI). Five of those causes of action include Ms. Rogalin, who is not a party to the Stockholders' Agreement. The only causes of action that implicate the Stockholders' Agreement are for Breach of Contract (Count III) and Breach of Implied Covenant of Good Faith and Fair Dealing (Count IV), both of which also allege breaches of the P&S.

The Complaint sets forth multiple requests for relief, including injunctive relief in the form of "An order for GFI and the Goldfarbs to provide a full accounting of the Defendants' assets and finances from January 2008 to the present" and "an order giving Pelikhov access to

GFI's corporate records." Mr. Pelikhov also prayed that the court provide "such other relief as the court deems just," which may include additional injunctive relief (as further described below).

The Complaint in this matter was docketed on November 19, 2015. Docket No. 1. The Defendants were served on or about November 25, 2015. Docket Nos. 3-6. The Defendants filed their Answer to the Complaint on or about January 4, 2016. Docket No. 7. **In their Answer, the Defendants did not object to the lawsuit or in any way reference any arbitration provisions that may be applicable.** *Id.*

On March 17, 2016, Plaintiff served on Defendants a large set of discovery requests, including Requests for Production of Documents to each of the Defendants, Interrogatories to each of the Defendants and Requests for Admissions to GFI. *See* Declaration of Val Gurvits, Exhibit 1 hereto, ¶ 2. On March 31, 2016, Defendants' counsel served Plaintiff's counsel with responses to the Requests for Admissions to GFI. *Id.*, ¶ 3.

On March 17, 2016, Plaintiff served on Defendants pursuant to Superior Court Rule 9A Plaintiff's Motion for Partial Judgment on the Pleadings on Count XI Pursuant to M.G.L. Ch. 165D, Section 16.04 or, in the Alternative, Motion to Compel Access to Corporate Records. *Id.*, ¶ 4. Defendants served an opposition to that Motion on March 28, 2016. *Id.*, ¶ 5. Plaintiff filed that Motion on April 6, 2016. *Id.*, ¶ 6.

On March 24, 2016, three months after Defendants were served with the Complaint, two months after Defendants answered the Complaint failing to raise the issue of arbitration, and a week after Plaintiff expended the costs of preparing and serving its discovery requests and the Motion for Partial Judgment on the Pleadings, Defendants served on Plaintiff their Motion to Compel Arbitration and to Stay the Proceedings, having for the first time raised the issue of

4

potential arbitration. In the sparsely argued Motion (which has less than one page of substance
and mis-cites the Massachusetts Arbitration Act), Defendants argue that this entire litigation
should be stayed and the parties should be compelled to arbitrate because of a limited and
inapplicable arbitration provision in the Stockholders' Agreement which isn't even implicated by
nearly every claim in the litigation.

## II.    Legal Argument

### A.    This Litigation Extends Far Beyond the Bounds of the Arbitration Clause

The first guiding principle of arbitration is that "arbitration is a matter of contract and a
party cannot be required to submit to arbitration any dispute which he has not agreed so to
submit." Massachusetts Highway Dept. v. Perini Corp., 444 Mass. 366, 374 (2005) (quoting
Local Union No. 1710, Intl. Assn. of Fire Fighters v. Chicoppee, 430 Mass. 417, 420-21 (1999)).
See, also, Unisys Finance Corp. v. Allan R. Hackel Organization, Inc., 42 Mass.App.Ct. 275, 280
(1997) ("Indeed, it is fundamental that a party has no right or obligation to demand arbitration if
there is no contract provision providing for it."); Hurlbut v. Gantshar, 674 F.Supp. 385, 390
(D.Mass. 1987) ("In the absence of an actual agreement to arbitrate a particular dispute or class
of disputes, the Court cannot compel arbitration."). "The question of arbitrability is ordinarily
for a court to decide, and courts will not defer that issue to arbitration absent *clear and
unmistakable evidence* that the parties agreed to do so." Merrimack College v. KPMG LLP, 88
Mass.App.Ct. 803, 808 (2016) (internal quotes and modifications omitted; emphasis added).
"[A] court may order arbitration of a particular dispute only where the court is satisfied that the
parties agreed to arbitration *that dispute*." *Id.* (quoting Granite Rock Co. v. international Bhd. Of
Teamsters, 561 U.S. 287, 297 (2010)).

The Arbitration Clause explicitly states that it only applies to a "dispute … between the parties hereto concerning this Agreement." By its very simple terms, the Arbitration Clause therefore does not apply to any disputes not concerning the Stockholders' Agreement or to any disputes concerning persons who are not parties to the Stockholders' Agreement. Specifically, the Arbitration Clause cannot apply to any of the Plaintiff's claims other than the claims for breach of contract against GFI, Lev Goldfarb and Alexander Goldfarb for their breach of the Stockholders' Agreement. In other words, the Arbitration Clause does not apply to the other 9 causes of action whatsoever and it doesn't apply to any claims against Ms. Rogalin and GFI for breach of the P&S.

Plaintiff's causes of action for Piercing the Corporate Veil (Count I), Breach of Fiduciary Duty (Count II), Unjust Enrichment (Count V), Fraudulent Misrepresentation (Count VI), Embezzlement (Count VII), Conversion (Count VIII), Civil Conspiracy (Count IX), Accounting (X) and violation of M.G.L. Chapter 156D, Section 16.04 (Count XI) do not arise out of the Stockholders' Agreement. They each arise out of a separate duty and obligation that the Defendants have to Plaintiff outside of the provisions set forth in the Stockholders' Agreement. In other words, even if the Stockholders' Agreement did not exist, the Plaintiff would still have these causes of action available to him. The plain language of the Arbitration Clause limits potential arbitration to only claims relating to either GFI, Lev Goldfarb, Alexander Goldfarb or Mr. Pelikhov's breaches of the Stockholders' Agreement and does not seek to include every cause of action that may relate to Mr. Pelikhov's ownership interest in GFI, fiduciary duties owed by Defendants to Mr. Pelikhov, torts committed by Defendants against Mr. Pelikhov and Defendants' violations of relevant Massachusetts corporate statute. If the arbitration provision meant to include every type of dispute that may arise out of Mr. Pelikhov's relationship with

6

Defendants, then the Arbitration Clause could have and would have so explicitly stated. *See*, *e.g.*, Merrimack College, 88 Mass.App.Ct. at 806-07 (rejecting broad reading of arbitration provision where it would have been a simple matter for the contract drafter to include terms into the sweep of arguably ambiguous contract language, as a court cannot add that expansive language after the fact).

Because nearly every single claim in the Complaint is outside of the ambit of the Arbitration Clause and because forcing the parties to engage in simultaneous litigation and arbitration would be unjust and judicially inefficient, the Court should deny Defendants' Motion.

**B.    The Arbitration Clause is Inapplicable Because of the Requested Injunctive Relief**

To the extent that the Arbitration Clause of the Stockholders' Agreement applies to the non-contract related causes of action in the Complaint (which, as explained above, it does not), the Arbitration Clause explicitly states that it does not apply to "a dispute for which injunctive relief is the appropriate remedy as provided in Sections 2.10, 4.5 and 5.7 of this Agreement." The Complaint sets forth at least two requests for injunctive relief, including "An order for GFI and the Goldfarbs to provide a full accounting of the Defendants' assets and finances from January 2008 to the present" and "an order giving Pelikhov access to GFI's corporate records." These requests for injunctive relief arise from Defendants freezing out Mr. Pelikhov from the accounting and corporate records of GFI, which Mr. Pelikhov alleges Defendants have done because they have been embezzling from GFI, failing to account for cash transactions and taking for their personal benefit the income of GFI so as to deprive Mr. Pelikhov, a GFI shareholder, of his share . *See, Complaint*, ¶¶ 19-38. These injunctive remedies are appropriate under M.G.L. Ch. 156D, Section 16.04 (for which Plaintiff has already file a motion for partial judgment) and under Sections 2.10, 4.5 and 5.7 of the Stockholders' Agreement.

Section 2.10 of the Stockholders' Agreement provides that injunctive relief shall be appropriate where any of the Stockholders violate the provisions of the Stockholders' agreement regarding the transfer or alienation of the shares in GFI.  Section 2.10 is implicated in this lawsuit because by their actions and omissions as alleged in the Complaint, the Defendants have sought to alienate Mr. Pelikhov from his ownership interest in GFI by withholding the profits of GFI from Mr. Pelikhov as he is entitled pursuant to law and the Stockholders' Agreement, denying Mr. Pelikhov access to GFI's corporate records as he is entitled pursuant to law and the Stockholders' Agreement, and denying Mr. Pelikhov his right to manage the company as a director pursuant to law.  The appropriate injunctive remedies in this situation are an order requiring Defendants to give Mr. Pelikhov access to the corporate records, requiring the Defendants to provide an accounting and requiring Defendants to permit Mr. Pelikhov to enjoy his right to manage the company as a director.  Mr. Pelikhov is further entitled to injunctive relief that Defendants add him back on as a Director and Officer of GFI in the records held by the Massachusetts Secretary of the Commonwealth.

Section 4.5 of the Stockholders Agreement provides for injunctive relief if the Defendants breach, *inter alia*, Section 4.2 of the Agreement (which prohibits Lev Goldfarb and Alexander Goldfarb from competing with GFI's business) and Section 4.4 of the Agreement (which prohibits Lev Goldfarb and Alexander Goldfarb from "divert[ing] for personal gain, any opportunity known to such Stockholder which may be of interest to the Corporation").  By embezzling the funds of GFI and placing in their own packet the cash received by GFI for sales made in its grocery store, Defendants have both competed with GFI and have diverted for personal gain the opportunities of GFI.  In addition to the injunctive relief Mr. Pelikhov is entitled under Section 2.10, all of which are also directly relevant to Defendants' breaches of

Sections 4.2 and 4.4, Mr. Pelikhov is entitled to additional injunctive relief in the form of an

injunction prohibiting Defendants from competing with GFI's business, diverting GFI's

opportunities to their own pockets and embezzling and converting property owned by GFI and or

due to Mr. Pelikhov.

Finally, Section 5.7 of the Stockholders' Agreement provides a general right to injunctive

relief for any breach of threatened breach of any provision of the Agreement, which covers every

other breach of Defendants of the Stockholders' Agreement as alleged in the Complaint.  For

such breaches, Mr. Pelikhov is entitled to all of the injunctive remedies set forth above and

further injunctive relief as may be deemed appropriate pursuant to further discovery into the

wrongdoings of Defendants.

Therefore, injunctive relief is the appropriate remedy for Mr. Pelikhov's claims, in

addition to legal remedies, Mr. Pelikhov's claims (that even implicate the Stockholders'

Agreement) fall outside of the limited Arbitration Clause.  Therefore, Defendants' Motion to

Compel Arbitration and to Stay Proceedings should be denied.

**C.    Defendants Have Waived Their Right to Arbitration (If They Ever Had It)**

Even if the Arbitration Clause was applicable (which it is not), Defendants have waived

their right to arbitration.  "[A]n arbitration provision has to be invoked in a timely manner or the

option is lost … the components of waiver of an arbitration clause are undue delay and a

modicum of prejudice to the other side."  Rankin v. Allstate Ins. Co., 336 F.3d 8, 12 (1st Cir.

2003).  See, also, Jones Motor Co. v. Chauffeurs, Teamsters & Helpers Local Union No. 633,

671 F.2d 38, 43 (1st Cir. 1982) ("Moreover, to require that to require that parties go to arbitration

despite their having advanced so far in court proceedings before seeking arbitration would often

be unfair, for it would effectively allow a party sensing an adverse court decision a second

9

chance in another forum.  Further, to hold that courts cannot find waiver would waste scarce
judicial time and effort.").

The Massachusetts Supreme Judicial Court has held that "[t]he right to arbitration may be
lost, as any contractual right which exists in favor of a party may be lost … through a failure
properly and timely to assert the right."  Home Gas Corp. of Mass., Inc. v. Walter's of Hadley,
Inc., 403 Mass. 772, 775 (1989) (internal quotes and citation omitted).  The SJC continued to
state that "A party must proceed with dispatch in seeking arbitration if it does not wish to waive
that right."  Id. (quoting Jones Motor Co., 671 F.2d at 42).  In determining whether a party has
waived their right to arbitration, "[t]he essential question is whether, under the totality of the
circumstances, the defaulting party acted 'inconsistently' with the arbitration right."  Martin v.
Norwood, 395 Mass. 159, 162 (Mass. 1985) (quoting Dickinson v. Heinold Sec., 661 F.2d 638,
641 (7th Cir. 1981)).

The SJC provides several factors for determining whether a party has waived its right to
arbitration:

> In deciding the issue of waiver, courts consider several factors. "[F]ederal courts
> typically have looked to whether the party has actually participated in the lawsuit
> or has taken other action inconsistent with his right ... whether the litigation
> machinery has been substantially invoked and the parties were well into
> preparation of a lawsuit by the time an intention to arbitrate was communicated
> by the defendant to the plaintiff ... whether there has been a long delay in seeking
> a stay or whether the enforcement of arbitration was brought up when trial was
> near at hand.... Other relevant factors are whether the defendants have invoked the
> jurisdiction of the court by filing a counterclaim without asking for a stay of the
> proceedings ... whether important intervening steps (e.g., taking advantage of
> judicial discovery procedures not available in arbitration ...) had taken place ...
> and whether the other party was affected, misled, or prejudiced by the delay ..."

Home Gas Corp., 403 Mass. at 775-76 (quoting Reid Burton Constr., Inc. v. Carpenters Dist.
Council of S. Colo., 614 F.2d 698, 702 (10th Cir.).  See, also, Shalaby v. Arctiv Sand Techs.,
Inc., 2014 WL 7235830, at *5 (Mass. Super. Dec. 15, 2014) ("Thus, 'a party may waive an

agreement to arbitrate by engaging in two courses of conduct: (1) taking actions that are completely inconsistent with any reliance on an arbitration agreement; and (2) delaying its assertion to such an extent that the opposing party incurs actual prejudice.'" (quoting <u>Johnson Assocs. Corp. v. HL Operating Corp.</u>, 680 F.3d 713 (6th Cir. 2012))).

Essentially every factor in this case counsels for finding that Defendants waived their right to compel arbitration (if they ever had it in the first place). Defendants have participated in this lawsuit by filing an answer two months before filing the Motion to Arbitration, have answered discovery and have responded to Plaintiff's Motion for Judgment on the Pleadings. The case has been pending for nearly four months before Defendants filed their Motion and will be significantly further along by the time the Motion can be decided by the Court. And most importantly, Plaintiff will incur actual prejudice if he is compelled to arbitrate as he filed his Complaint months ago, has expended significant expenses and resources sending out discovery requests, which are shortly due (some of which have already been answered), and has already filed a Motion for Partial Judgment, which is almost certain to be granted. Defendants have in fact taken actions which are completely inconsistent with any reliance on an arbitration agreement.

Defendants' actions are consistent with their well-documented extraordinary efforts to deny Mr. Pelikhov his rights. After years of harassment and freezing Mr. Pelikhov out of GFI, and even after the filing of the present lawsuit and realization that they were about to lose on Mr. Pelikhov's Motion for Partial Judgment on the Pleadings, Defendants have concocted yet another way to thwart Mr. Pelikhov's efforts to enforce his rights.

Defendants' Motion should therefore be denied and Mr. Pelikhov should have his day in court to have his rights enforced and to be provided both the equitable and legal relief to which he is entitled from this Court.

## III.    Conclusion

For the reasons set forth above in detail, Defendants' Motion to Compel Arbitration and to Stay the Proceedings should be denied in its entirety.

Respectfully submitted,
Eugene Pelikhov
By his Attorneys,

_____
Valentin D. Gurvits (BBO# 643572)
Tel: (617) 928-1804
vgurvits@bostonlawgroup.com
Matthew Shayefar (BBO# 685927)
Tel: (617) 928-1806
matt@bostonlawgroup.com
BOSTON LAW GROUP, PC
825 Beacon Street, Suite 20
Newton Centre, MA 02459
Fax: (617) 928-1802

---

**Certificate of Service**

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by first class mail on April 6, 2016.

_____
Val Gurvits, Esq.

---

Dated: April 6, 2016


TRUE COPY, ATTEST
DEPUTY ASS'T. CLERK

| **NOTICE TO APPEAR FOR** Rule 12 Hearing | DOCKET NUMBER 1677CV00332 | **Trial Court of Massachusetts The Superior Court** |
|---|---|---|

| CASE NAME: **National Refrigeration, Inc. vs. Town of North Andover** | Thomas H. Driscoll, Jr., Clerk of Courts |
|---|---|

| TO: File Copy | COURT NAME & ADDRESS Essex County Superior Court - Salem J. Michael Ruane Judicial Center 56 Federal Street Salem, MA 01970 |
|---|---|

The Court will hear the following event:

### Rule 12 Hearing

Counsel should appear as follows:

**Date: 05/10/2016**

**Time: 02:00 PM**

**Session/ Courtroom Location: Civil A / SALEM-5th FL, CR H (SC)**

FURTHER ORDER OF THE COURT:

| DATE ISSUED 04/21/2016 | ASSOCIATE JUSTICE **Hon. Timothy Q Feeley** | **Thomas H. Driscoll, Jr., Clerk of Courts** |
|---|---|---|

Date/Time Printed: 04-21-2016 12:50:20

SCV012a\ 06/2014

| | DOCKET NUMBER | Trial Court of Massachusetts |
|---|---|---|
| **NOTICE TO APPEAR FOR**<br>Rule 12 Hearing | **1677CV00332** | **The Superior Court** |

| CASE NAME:<br>**National Refrigeration, Inc. vs. Town of North Andover** | Thomas H. Driscoll, Jr., Clerk of Courts |
|---|---|

| TO:<br><br>File Copy | COURT NAME & ADDRESS<br><br>Essex County Superior Court - Salem<br>J. Michael Ruane Judicial Center<br>56 Federal Street<br>Salem, MA 01970 |
|---|---|

The Court will hear the following event:

### Rule 12 Hearing

Counsel should appear as follows:

**Date: 05/10/2016**

**Time: 02:00 PM**

**Session/ Courtroom Location: Civil A / SALEM-5th FL, CR H (SC)**

**FURTHER ORDER OF THE COURT:**

| DATE ISSUED | ASSOCIATE JUSTICE | |
|---|---|---|
| 04/21/2016 | **Hon. Timothy Q Feeley** | **Thomas H. Driscoll, Jr., Clerk of Courts** |

Date/Time Printed: 04-21-2016 12:50:20                                                            SCV012al 09/2014